IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

Richmond Division

MARKWEST LIBERTY MIDSTREAM
AND RESOURCES, LLC,
     Appellant,

v.                                                                                    Civil No. 3:23cv593 (DJN)

MERIDIEN ENERGY, LLC,
     Appellee.

**MEMORANDUM OPINION**

This matter comes before the Court on (1) Appellant MarkWest Liberty Midstream and

Resources, L.L.C.'s ("Appellant" or "MarkWest") Consolidated Appeals of orders entered by the

United States Bankruptcy Court for the Eastern District of Virginia (the "Bankruptcy Court")

approving a settlement and Chapter 11 Plan of Reorganization for Appellee Meridien Energy,

LLC ("Appellee" or "Meridien"); and (2) on Appellee's Motion to Dismiss the Consolidated

Appeals, ("Motion," ECF No. 27). For the reasons set forth below, the Court will DENY

Appellee's Motion, (ECF No. 27), will REVERSE the Bankruptcy Court's Settlement Order and

will REMAND these proceedings to the Bankruptcy Court to more thoroughly consider whether

the Settlement qualifies as in the best interest of the bankruptcy estate and as a fair and equitable

outcome for the estate's creditors. The Court will also REVERSE the Bankruptcy Court's

Confirmation Order for the reasons stated herein, so that the Bankruptcy Court may properly

determine the impact of reversal of the Settlement Order on the Plan's terms and make any

necessary revisions to the Plan as needed upon reexamination of the proposed settlement agreement.[1]

## I.    BACKGROUND

This case arises out of bankruptcy cases commenced by Appellee.  On August 28, 2023, the Bankruptcy Court approved a settlement agreement ("Settlement Agreement") between Appellee and Intervenors William Schettine, three members of his family who worked as officers of Appellee (Heather Schettine, James Schettine and Angela Schettine, altogether the "Family"); six entities that William Schettine owned or previously owned (East Coast Transportation, Inc. ("ECT"), AJAR International, Inc. ("AJAR"), Meridien Media, LLC ("MM"), 2DP International, LLC ("2DP"), Meridien Holdings, LLC ("MH"), and Meridien West, LLC ("MW"), altogether the "Affiliates"); Meridien Pipeline Services, LLC ("MPS"); and WB Pipeline, LLC ("WBP").[2] MarkWest, a natural gas services company and general unsecured creditor with claims against Appellee, appealed the Bankruptcy Court's order to this Court.  (ECF No. 1.)

---

[1]     The Court finds that oral argument would not aid the decisional process; therefore, the Court resolves the appeal on the pleadings and the record.

[2]     MPS and WBP did not move to intervene in these consolidated appeals.  However, for ease of discussion, this Memorandum Opinion refers to all twelve of these individuals and entities (i.e., the ten that moved to intervene, along with MPS and WBP) as the "Intervenors."

## A.    Factual Background and Bankruptcy Court Proceedings[3]

Appellee constitutes a Virginia limited liability company operating a full-service pipeline construction business headquartered in Randolph, New York. (Bankr. Mem. Op. at 1.)  William Schettine serves as Appellee's sole member and Chief Executive Officer ("CEO"), while Appellee has sixteen full-time employees, with twelve employees paid on an hourly basis and four employees (William Schettine, Heather Schettine, James Schettine and Angela Schettine) receiving a salary.  (*Id.*)

On November 16, 2018, Appellant commenced a breach-of-contract lawsuit against Appellee in the District Court for the City and County of Denver, Colorado ("Colorado Court") in connection with a project to construct certain segments of a natural gas pipeline in West Virginia.  (*Id.* at 3.)  In response, Appellee brought various counterclaims against Appellant, and the Colorado Court held a trial in October 2021, resulting in a net judgment in favor of Appellant in the amount of $13,283,384.64 (the "Judgment").  (*Id.*)  Both parties appealed elements of the Judgment, and these appeals remain pending in the Colorado Court of Appeals.  (*Id.*)

The failed project and resulting litigation evidently left Appellee with "debts that no honest man can pay."[4]  On April 20, 2023, citing the costs and burdens related to termination of

---

[3]      Unless otherwise cited, the Court takes these facts from the Bankruptcy Court's Memorandum Opinion ("Bankr. Mem. Op.", ECF No. 14-16) explaining its reasoning for approving the Settlement Agreement, (ECF No. 13-4).  The Court cites to the page numbers for these documents as given at the bottom of the PDF filing for each document and, unless otherwise stated, provides the ECF number of the document as found on the docket sheet of the case before this Court:  *MarkWest Liberty Midstream & Res., LLC v. Meridien Energy, LLC*, Case No. 3:23cv593 (E.D. Va. 2023).

[4]      *See* Bruce Springsteen, "Atlantic City" (https://brucespringsteen.net/track/atlantic-city/) [perma: https://perma.cc/V9DX-MRWQ] ("Well I got a job and tried to put my money away / But I got debts that no honest man can pay"); *see also* Springsteen, "Johnny 99" (https://brucespringsteen.net/track/johnny-99/) [perma: https://perma.cc/42M9-R7G3] ("Now judge judge I had debts no honest man could pay").

the West Virginia pipeline project and the consequent litigation in Colorado, as well as further financial setbacks stemming from the COVID-19 pandemic, Appellee initiated a Chapter 11 bankruptcy proceeding by filing a voluntary petition. (Bankr. Mem. Op. at 1, 3.) During the pendency of this action, Appellee continued to operate its business as a debtor in possession pursuant to 11 U.S.C. §§ 1107(a) and 1108. (*Id.* at 2.) On April 27, 2023, the Bankruptcy Court designated John W. Teitz ("Teitz"), a managing director of Compass Advisory Partners, LLC whom Appellee retained as Chief Restructuring Officer to manage Appellee's day-to-day operations and assist in its restructuring efforts, to perform the duties that the Bankruptcy Code imposed upon Appellee. (*Id.* at 2.)

As of the time of its Chapter 11 filing in April 2023, Appellee listed approximately $19.5 million in total debt obligations, with about $5.2 million of that debt secured by substantially all of Appellee's assets. (*Id.* at 3.) Bank7 Corporation ("Bank7") held approximately $4 million of the secured indebtedness, while William Schettine held $1.16 million under a line of credit dated March 30, 2023. (*Id.*) William Schettine's debt was secured by a second priority lien behind Bank7 in substantially all of Appellee's assets. (*Id.*) At the time of the April 2023 filing, Appellee had unsecured debts totaling approximately $14.3 million, inclusive of the disputed claim from Appellant. (*Id.* at 4.)

Just after filing its bankruptcy petition, Appellee filed a motion (the "DIP Financing Motion") to seek approval of interim post-petition financing ("DIP Financing") from ICT-DIP, LLC (the "DIP Lender") in the amount of $1.6 million, for the purpose of "preserving and maximizing" the value of its estate. (*Id.* at 4.) William Schettine, as the "Plan Sponsor," agreed to subordinate his second lien position in Appellee's assets to the administrative claim and liens

4

of the DIP Lender, and on April 25, 2023, the Bankruptcy Court approved the DIP Financing Motion on an interim basis. (*Id.* at 4.) On May 4, 2023, the Office of the United States Trustee filed a statement indicating that no unsecured-creditors committee existed in the case. (*Id.*) The Bankruptcy Court noted that "[a]lthough its claim is disputed by [Meridien], MarkWest is, by far, [Meridien's] largest unsecured creditor." (*Id.*) On June 8, 2023, the Bankruptcy Court entered a final order granting Appellee's motion for DIP Financing. (*Id.* at 5.)

On July 29, 2023, Appellee filed a motion ("the 9019 Motion") to approve the Settlement Agreement and compromise pursuant to Federal Rule of Bankruptcy Procedure 9019, and on August 23, 2023, filed its Disclosure Statement and Chapter 11 Plan of Reorganization. (*Id.* at 1, 6.) In its 9019 Motion, Appellee represented that its agents notified counsel for the Intervenors on April 26, 2023, that it would be investigating potential actions against them pursuant to its fiduciary duties to the bankruptcy estate, for the purpose of identifying any claims that could maximize the value of the estate. (*Id.* at 6–7.)

The 9019 Motion also noted that after reviewing Appellee's transactional history and financial records, Appellee identified certain asset transfers for the benefit of the Intervenors within five years preceding the bankruptcy filing and issued a demand letter, dated July 19, 2023, identifying possible claims and demanding payment from the Intervenors, jointly and severally. (*Id.* at 7.) Appellee represented that it held good-faith settlement negotiations with the Intervenors regarding the identified asset transfers and any potential defenses to avoidance and recovery that Intervenors intended to assert, including defenses of contemporaneous and subsequent new value. (*Id.*) After these negotiations, Appellee and the Intervenors reached the Settlement Agreement, to which no creditor or party in interest objected, except for MarkWest. (*Id.* at 7–8.)

5

The Settlement Agreement's key terms provide that Appellee will release the Intervenors from any and all claims and causes of action that Appellee has against them, including claims under Chapter 5 of the Bankruptcy Code, in exchange for: (1) a payment of $200,000; (2) the reduction to $500,000 of the $1.16 million secured claim that William Schettine asserted, which would then constitute an allowed claim; and (3) a reduction to $100,000 of the $720,000 unsecured claim asserted by William Schettine, which would then be an allowed claim. (*Id.* at 8.) The Settlement Agreement similarly releases the Intervenors' "current and former directors, managers, officers, predecessors, successors, affiliates, assigns, subsidiaries, partners, members, limited partners, general partners, principals, employees, agents, trustees, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, and other professionals and advisors and any such person's or entity's respective heirs, executors, estates, and nominees" from any and all claims arising under federal, state "or other applicable rule or law." (Appendix of Appellant (ECF No. 33-1) ("MW App.") at MW App. 0154.) The Settlement Agreement also provides for mutual releases by and between Appellee and Intervenors of all claims and causes of action that each may assert against the other. (Bankr. Mem. Op. at 8.)

In support of the Settlement Agreement, Appellee highlighted the work of its financial advisor MorrisAnderson & Associates, Ltd. ("MorrisAnderson"), which assisted Appellee with its investigation and analysis of its financial records and transactional history to identify potential claims for maximizing the value of the bankruptcy estate. (*Id.*) After analyzing Appellee's financial records, Mark Welch ("Welch"), a principal of MorrisAnderson, prepared a report (the "MorrisAnderson Report" or "the Report"), which identified all relevant cash transactions that occurred in the five-year period before Appellee's bankruptcy filing, including any

6

disbursements for the benefit of Intervenors. (*Id.* at 9.) Welch presumed that all outflowing cash transactions in the Report benefited William Schettine. (*Id.* at 10.)

Welch also conducted a solvency analysis of Appellee's business, concluding that Appellee qualified as solvent in 2018, insolvent in 2019, solvent in 2020 and insolvent from 2021 thereafter. (*Id.*) Based on his review, Welch concluded that Appellee had a potential claim against William Schettine in the amount of $800,000, stemming from transfers in 2019.

Appellee appointed John Rose ("Rose") to serve as Independent Director, a role in which Rose oversaw the investigation of potential claims and worked with Appellee's counsel and MorrisAnderson to formulate demands and engage in settlement negotiations. (*Id.* at 11.)

On August 1, 2023, MarkWest served on Meridien a set of production requests and interrogatories pursuant to Rule 9019, asking for (among other items) Meridien to (1) identify all potential claims that Meridien held against the Intervenors from April 20, 2018 to the present; (2) identify all transfers to, or for the benefit of, the Intervenors during this time period; and (3) describe the relationship between the Intervenors and Meridien. (MW App. 0163–0180.) On August 14, 2023, Meridien responded to MarkWest's discovery requests. (*Id.*) Meridien did not identify specific claims against the Intervenors, nor did it identify any transfers to, or for the benefit of, Intervenors from April 20, 2018 to the present, but it did produce the July 19, 2023 demand letter that it sent to the Intervenors. (*Id.*) The demand letter stated that Meridien's professionals concluded that the Intervenors "have significant exposure" and that Meridien "believes it can prevail at trial and secure a judgment against [Intervenors] in the amount of $1,250,000." (*Id.* at 0165, 0185.)

On August 16, 2023, MarkWest filed its objection to the 9019 Motion. (Bankr. Mem. Op. at 1.) On August 23, 2023, the Bankruptcy Court conducted an evidentiary hearing on the

7

9019 Motion. (*Id.*) During the hearing, Rose testified that he authorized an initial demand of $1.125 million; that the initial demand letter included claims for excess compensation; and that Meridien's counsel did not identify any potential breach of fiduciary duty claims. (*Id.* at 11 n.8.) Rose further testified that the Intervenors made an initial offer of $25,000, and after subsequent negotiations over a period of nine to ten days, Rose authorized Appellee to enter into the Settlement Agreement. (*Id.* at 11–12.)

Opposing the Settlement Agreement, MarkWest offered the testimony of Thomas Jeremiassen ("Jeremiassen") of Diversified Specialists, Inc., an accounting expert and financial advisor to fiduciaries and debtors in insolvency situations. (*Id.* at 12.) Jeremiassen testified that in his opinion, "the investigation and the analysis into the causes of action against the parties being released under the proposed settlement is superficial, inadequate, and incomplete." (*Id.*) He also questioned the methodology of MorrisAnderson's solvency analysis and the timing of the Settlement Agreement, theorizing that one possible reason for the timing of the settlement constituted the parties' desire to avoid conversion of the case into one governed by Chapter 7 of the Bankruptcy Code, which would lead to Appellee losing control of its claims. (*Id.*)

On cross examination, Jeremiassen acknowledged that (1) he had limited experience in the oil and gas industry, little experience in the construction industry and no experience with pipeline contractors; and (2) he was not expressing an opinion on the underlying solvency of Appellee or on the correctness of Welch's conclusions. (*Id.* at 13.) Jeremiassen also was unable to identify any specific claims for breach of fiduciary duty or breach of contract, but nonetheless testified that additional work would need to occur for a proper analysis, estimating that doing so that doing so would take between fifty and 100 hours and cost $40,000 to $80,000, "depending on the availability of information and records." (*Id.*) He did not dispute Appellee's contention

8

that it has insufficient funds to conduct a more extensive analysis or that it lacks the resources to remain in bankruptcy for an extended time. (*Id.*)

On August 28, 2023, the Bankruptcy Court entered the Settlement Order approving the Settlement Agreement with the Intervenors, ruling that "the relief requested in the [Settlement] Motion is in the best interests of [Appellee's] estate, its creditors, and other parties in interest" and that entering into the Settlement Agreement constituted "an appropriate and reasonable exercise of [Appellee's] business judgment[.]". (ECF No. 13-26 at 2.)

On September 11, 2023, MarkWest timely appealed the Settlement Order,[5] and on September 12, 2023, Appellee filed: (1) its Amended Chapter 11 Plan of Reorganization (the "Plan"), (ECF No. 13-31), incorporating the terms of the Settlement Agreement, and (2) its Disclosure Statement, (ECF No. 13-30), which included a Liquidation Analysis and Financial Projections, (ECF No. 13-32). In addition to incorporating the Settlement Agreement, the Plan included supplemental terms, including William Schettine's agreement to: contribute $1.6 million to Appellee's estate; pledge a $1 million standby letter of credit (defined as the "Plan Collateral"); personally guarantee Appellee's professionals' unpaid fees incurred in the Bankruptcy Case; and contribute $100,000 to fund litigation against third parties for the benefit of Appellee's estate through a "Litigation Trust", among other terms.[6]

---

[5]    MarkWest Liberty and Midstream Resources, LLC's Notice of Appeal, *In re Meridien Energy, LLC*, No. 23-31377 (Bankr. E.D. Va. Sept. 11, 2023), ECF No. 297.

[6]    Order (I) Granting Final Approval of the Debtor's Disclosure Statement (II) Confirming Amended Chapter 11 Plan of Reorganization of Meridien Energy, LLC, and (III) Granting Related Relief, *In re Meridien Energy, LLC*, No. 23-31377 (Bankr. E.D. Va. Nov. 15, 2023) (hereinafter "Confirmation Order"), ECF No. 368, ¶ 24.

On October 6, 2023, the Bankruptcy Court issued its Settlement Opinion, from which the

Court draws many of the facts discussed *supra*, in support of its Settlement Order. (ECF No. 14-

16.)  On October 10, 2023, MarkWest filed its Objection to the Amended Chapter 11 Plan (the

"Plan Objection").  Among other points, MarkWest argued that the Plan's drafters did not

propose the Plan in good faith, because while the Settlement Agreement remained ineffective

due to the pending appeal before this Court, Appellee nonetheless operated as if the Plan was

already in effect.  (Appellant's Opp. Br. to Mot. to Dismiss (ECF No. 34) ("Opp.") at 13–14.)

MarkWest also contended that the Plan did not serve the best interests of creditors, because the

Plan was improperly premised on the Settlement Agreement and therefore did not clearly

account for a potential appellate reversal of the Settlement Agreement.  (*Id.* at 14.)  Furthermore,

Appellant contended that the Plan constituted an "end-run around the pending appeal as to the

Settlement Order" by releasing Appellee's claims against numerous related parties.  (*Id.*)

On November 13, 2023, the Bankruptcy Court held a confirmation hearing on the Plan

(the "Confirmation Hearing").  No. 23-31377 (Bankr. E.D. Va. Nov. 13, 2023), ECF No. 386.

During the hearing, counsel for MarkWest expressed concern that the Plan did not address the

circumstances of reversal of the Settlement Agreement, suggesting that the Plan include a

"toggle" as an alternative path accounting for potential reversal.  *Id.* at 114–17.  In response,

counsel for Meridien stated that a "toggle" would be unnecessary, elaborating as follows:

> MR. ROESCHENTHALER [counsel for Meridien]: [T]his plan is structured in a
> way where you don't need a toggle.  The senior – class 1 and class 2, they each get
> paid in turn, okay?  And their debt's turned off and they got an (indiscernible).
> They're paid over a period of time irrespective of the outcome of the appeal.  Mr.
> Schettine's claim, class 3, he has a claim that right now that is a reduced number.
> Could be a large number, but it's a reduced number right now.  Could be a larger
> number depending on how – the outcome of the appeal.  How does that impact any
> other clients?  Classes 4 and 5 are unimpaired, they get paid in full.  Class 6, they
> get paid the immediate distribution, again, irrespective of the outcome of the appeal,
> plus – the upside – for the next two years.  Based on net income, which is not

impacted by Schettine's claim, whether it's 500 or more, because he's getting PIK interest. He's not getting paid. So it's not like there's a financial burden created in the event that that appeal is successful. So does it benefit the estate in the long run? Sure, we've reduced claims. But does it modify the treatment of any other clause? No. This plan was structured to truly, to the greatest extent possible, to ensure that what we're promising people, they will get. Does that make sense, Your Honor?

THE COURT: Well, what if the 9019 motion is reversed? What happens?

MR. ROESCHENTHALER: So Mr. Schettine would have an increased secured claim. The 200,000 dollars tendered to date, that would be an issue between him and the DIP lender, candidly, because they're going to get those dollars. The actions would be relegated and all state [sic] actions, all the rights the debtor has to the state [sic] actions, are in the litigation trust. And to the Court's point, is an independent a more suitable party? Yes. That's why the trust reads, in the event of the appeal being successful, we have that second person. . . . Then Mr. Schettine has an unsecured claim that would increase and potentially have some impact on the ultimate distribution on secured creditors. Considering that the size of the claim's for, assuming all claims are allowed, it would be relatively immaterial.

*Id.* at 128–30; *id.* at 102–04. On November 15, 2023, the Bankruptcy Court confirmed the Plan.

No. 23-31377 (Bankr. E.D. Va. Nov. 15, 2023), ECF No. 368. On November 29, 2023,

Appellant noted an appeal from the Confirmation Order. *Id.*, ECF No. 376. On November 30,

2023 (the "Effective Date"), Appellee filed a notice (the "Effective Date Notice") that the

Effective Date occurred under the Plan, i.e., giving notice that Appellee emerged from

bankruptcy as a reorganized entity. *Id.*, ECF No. 379.

**B.     Procedural History of Appeal**

As noted above, on September 11, 2023, MarkWest filed its Notice of Appeal with this

Court. (ECF No. 1.) On November 29, 2023, MarkWest initiated a second appeal,[7] seeking this

Court's review of the Bankruptcy Court's Confirmation Order entered on November 15, 2023.

Because the second appeal involves the same parties and same underlying bankruptcy case, the

---

[7]     *MarkWest Liberty Midstream & Res., LLC v. Meridien Energy, LLC*, No. 3:23cv816 (E.D. Va. 2023), ECF No. 1.

Court directed the Parties to file positions on consolidation of the two appeals. (ECF No. 19.) The Parties did so in a joint filing. (ECF No. 21.) Accordingly, on December 22, 2023, the Court consolidated the two bankruptcy appeals into Case No. 3:23cv593. (ECF No. 22.)

On February 8, 2024, Appellee filed the instant Motion to Dismiss the Consolidated Appeals, arguing that the relief that Appellant seeks — reversal of the Bankruptcy Court's Confirmation Order and Settlement Order — qualifies as equitably moot. (ECF Nos. 27–28.) In Appellee's telling, as Appellant did not seek or obtain a stay pending appeal of the Confirmation Order or Settlement Order, the parties have already "substantially consummated" the relief that the Bankruptcy Court authorized. (Appellee's Mem. in Supp. of Mot. to Dismiss (ECF No. 28) ("Mem.") at 2.) As a result, Appellee argues, the relief that Appellant seeks on appeal cannot occur without negatively affecting the interests of third parties and the relief that the Bankruptcy Court already granted (including Appellee's exit from bankruptcy pursuant to its reorganization plan). (*Id.* at 3.)

On February 29, 2024, Appellant filed its opposition brief to the Motion, (ECF No. 34), presenting three key points. First, Appellant argues that Appellee's "equitable mootness" argument stands in stark contrast to what Appellee's counsel argued to the Bankruptcy Court to secure confirmation of the reorganization plan. (Opp. at 2–3.) To Appellant, this alleged about-face constitutes a "quintessential situation for application of judicial estoppel," as Appellee cannot make one argument before the Bankruptcy Court and then argue the opposite to support dismissal of the appeal. (*Id.* at 3.) Second, Appellant argues that Appellee had no right to start effectuating the terms of the Settlement Agreement before satisfaction of a condition precedent: exhaustion of the Settlement Agreement's appeal process. (*Id.*) Third, Appellant contends that Appellant's equitable mootness argument constitutes "an ill-fated attempt to circumvent the

12

Court's obligation to exercise appellate jurisdiction," as Appellant fails to meet its burden of demonstrating that the appeal qualifies as equitably moot. (*Id.*)

On March 5, 2024, Appellee filed a reply brief, rendering the Motion to Dismiss ripe for review. (ECF No. 40.)

Furthermore, pursuant to the Court's Scheduling Orders, (ECF Nos. 25, 30), and the Federal Rules of Bankruptcy Procedure, Appellant filed its initial brief and appendix for the Consolidated Appeals on February 29, 2024. (ECF No. 33.) On March 29, 2024, Appellee filed its own initial brief and appendix. (ECF No. 42.) On April 26, 2024, Appellant filed its reply brief. (ECF No. 44.) The Consolidated Appeals thus stand ripe for review.[8]

## II.  STANDARD OF REVIEW

When reviewing a decision of the bankruptcy court rendered in a core proceeding,[9] "a district court functions as an appellate court and applies the standards of review generally applied in federal courts of appeal." *Paramount Home Ent. Inc. v. Cir. City Stores, Inc.*, 445 B.R. 521, 526–27 (E.D. Va. 2010) (citing *In re Webb*, 954 F.2d 1102, 1103–04 (5th Cir. 1992)). Specifically, "[t]he district court reviews the bankruptcy court's legal conclusions *de novo* and its

---

[8]     In addition, Intervenors (other than MPS and WBP) filed multiple Notices in support of Appellee. Intervenors filed a Notice of Joinder to Appellee's Motion to Dismiss, (ECF No. 31), and a Notice of Joinder to Appellee's Reply Brief supporting its Motion, (ECF No. 41). On March 29, 2024, Intervenors also filed a brief in response to Appellant's brief. (ECF No. 43.) In this filing, Intervenors stated that they "adopt the statements and arguments set forth in the Brief of Appellee." (*Id.* at 2.) In their view, the Bankruptcy Court did not abuse its discretion, and they unsurprisingly take the position that harm would occur if this Court were to reverse the Settlement Order and unwind the Settlement Agreement, contending that the Settlement Agreement maximizes value for Appellee's estate and for the general unsecured creditors. (*Id.* at 2–3, 7.)

[9]     The parties do not contest the claims' status as core proceedings. (Mem. at 16 n.17) ("The two Orders on review emanate from 'core' bankruptcy proceedings."); (Opp. at 22) (noting that parties have the right to "appeal final judgments of a bankruptcy court in core proceedings to the district court, which reviews them under traditional appellate standards").

factual findings for clear error." *Mar-Bow Value Partners, LLC v. McKinsey Recovery & Transformation Servs. US, LLC*, 578 B.R. 325, 328 (E.D. Va. 2017) (citing *In re Harford Sands Inc.*, 372 F.3d 637, 639 (4th Cir. 2004)). Clear error exists when the district court "'is left with the definite and firm conviction that a mistake has been committed.'" *Id.* (quoting *Anderson v. Bessemer City*, 470 U.S. 564, 573 (1985)).

In cases involving mixed questions of law and fact, "the [c]ourt reviews findings of fact under the clearly erroneous standard and reviews *de novo* the legal conclusions derived from those facts." *Patterson v. Mahwah Bergen Retail Grp., Inc.* (*Mahwah*), 636 B.R. 641, 662 (E.D. Va. 2022) (citing *Gilbane Bldg. Co. v. Fed. Reserve Bank of Richmond, Charlotte Branch*, 80 F.3d 895, 905 (4th Cir. 1996)). A district court reviews a bankruptcy court's use of its equitable powers for abuse of discretion. *ReGen Cap. I, Inc. v. Halperin*, 547 F.3d 484, 492 (2d Cir. 2008); *Litty v. Litty*, 1998 WL 398737, at *2 (4th Cir. July 8, 1998).

On appeal, a court must consider whether the court below exceeded its constitutional or statutory authority. A court on appeal reviews questions of jurisdiction *de novo*. *Tillman v. Resolution Trust Corp.*, 37 F.3d 1032, 1034 (4th Cir. 1994). Finally, on a motion to dismiss an appeal from the Bankruptcy Court, this Court has discretion whether to find that an appeal qualifies as equitably moot. *Behrmann v. Nat'l Heritage Found.*, 663 F.3d 704, 714 (4th Cir. 2011); *Mahwah*, 636 B.R. at 696.

## III.   ANALYSIS

The Court begins by considering Appellee's Motion to Dismiss the Consolidated Appeals, given the dispositive nature of this Motion. Because the Court has decided to deny the Motion for the reasons discussed *infra*, the Court then proceeds to the underlying Consolidated Appeals.

14

### A.    Motion to Dismiss

Appellee grounds its Motion to Dismiss on the doctrine of equitable mootness,

contending that the relief that the Settlement Order and Confirmation Order authorized has been

substantially consummated and that the relief that Appellant seeks on appeal cannot be

accomplished without negatively affecting third parties' interests and the Bankruptcy Court's

already-granted relief, including Appellee's exit from bankruptcy pursuant to the Plan. (Mem. at

2–3.)

### 1.    Equitable Mootness Doctrine Generally

"Equitable mootness is a pragmatic doctrine grounded in the notion that, with the passage

of time after a judgment in equity and implementation of that judgment, effective relief on appeal

becomes impractical, imprudent, and therefore inequitable." *In re Bate Land & Timber LLC*,

877 F.3d 188, 195 (4th Cir. 2017).  The doctrine's application "is based on practicality and

prudence, does not employ rigid rules, and requires that a court determine whether judicial relief

on appeal can, as a pragmatic matter, be granted." *Id.*  In making this determination, courts can

examine the following relevant factors:

> (1) whether the appellant sought and obtained a stay;
> (2) whether the reorganization plan or other equitable relief has been substantially consummated;
> (3) the extent to which the relief requested on appeal would affect the success of the reorganization plan or other equitable relief granted; and,
> (4) the extent to which the relief requested on appeal would affect the interests of third parties.

*Id.*  The reviewing court has discretion whether to find an appeal equitably moot.  *Behrmann*,

663 F.3d at 714 ("In sum, we decline to exercise our discretion to dismiss this appeal as

equitably moot.").  As the Eighth Circuit observed, when a party asks a district court:

> to invoke equitable mootness to preclude a party whose rights have been impaired
> by a Chapter 11 confirmation order from obtaining supervisory review of the merits

15

of the plan by an Article III court that has an 'unflagging obligation' to exercise its appellate jurisdiction, the request should be granted only in extremely rare circumstances.

*In re VeroBlue Farms USA, Inc.*, 6 F.4th 880, 891 (8th Cir. 2021). And, notably, "equitable mootness applies to specific claims, not entire appeals and must be applied with a scalpel rather than an axe." *In re Charter Commc'ns, Inc.*, 691 F.3d 476, 481–82 (2d Cir. 2012) (cleaned up).

Before addressing the factors, however, the Court notes that a certain "threshold issue[] weigh[s] against a finding of equitable mootness." *Mahwah*, 636 B.R. at 697. As explained *supra*, the Settlement Agreement included Appellee's release of the Intervenors from *any and all claims and causes of action* that Appellee has against them, including claims under Chapter 5 of the Bankruptcy Code, in exchange for: (1) a payment of $200,000; (2) the reduction to $500,000 of the $1.16 million secured claim asserted by William Schettine, which would then constitute an allowed claim; and (3) a reduction to $100,000 of the $720,000 unsecured claim asserted by William Schettine, which would then be an allowed claim. (Bankr. Mem. Op. at 8.) The Settlement Agreement also provides for mutual releases by and between Appellee and Intervenors of all claims and causes of action that each may assert against the other. (*Id.*)

To be sure, the releases at issue here pale in comparison to the much more sweeping releases that this Court examined in *Mahwah*, where the proposed releases extinguished "the claims of *at least* hundreds of thousands of potential plaintiffs not involved in the bankruptcy." *Mahwah*, 636 B.R. at 655. Here, the releases involve potential *estate* claims (i.e., by one party — the debtor in possession) against Intervenors and their current and former directors, managers, officers, affiliates, members, principals, employees, attorneys, agents and accountants, among other individuals and entities. (MW App. 0154.) However, the proposed releases' "any and all" language nonetheless underscores their relatively broad nature.

16

For the Court to decline to exercise its appellate review over a Plan that would release estate claims (including claims that may have nothing to do with — and indeed could predate — the bankruptcy proceedings) against numerous individuals and entities would cut against procedural fairness. "Equity strongly supports appellate review of issues consequential to the integrity and transparency of the Chapter 11 process." *In re Pac. Lumber Co.*, 584 F.3d 229, 251–52 (5th Cir. 2009) (deeming a claim to not qualify as equitably moot, because "the goal of finality sought in equitable mootness analysis does not outweigh a court's duty to protect the integrity of the process," and seeing "little equitable about protecting the released non-debtors from negligence suits arising out of the reorganization").

In addition, where the facts do not "do not support the conclusion that 'effective judicial relief is no longer practically available,'" a court should reject applying the equitable mootness doctrine. *In re Bate Land & Timber LLC*, 877 F.3d 188, 195 (4th Cir. 2017); *Mahwah*, 636 B.R. at 698. Indeed, "allowing a boilerplate nonseverability clause, without more, to determine the equitable mootness question would give the debtor and other negotiating parties too much power to constrain Article III review." *In re Charter Commc'ns, Inc.*, 691 F.3d at 485.

Whether the releases here qualify as severable constitutes a key issue in dispute. Appellee contends that the releases constitute a nonseverable term, pointing to the Confirmation Order's statement that the "releases set forth in the Plan are nonseverable from . . . all other terms of the Plan" and that "[t]he provisions of the Plan and this Confirmation Order, including the findings of fact and conclusions of law set forth herein, are nonseverable and mutually dependent." (Mem. at 14, citing No. 23-31377 (Bankr. E.D. Va. Nov. 15, 2023), ECF No. 368 at 25–26, 40.) Appellant disagrees, arguing that Appellee has taken contradictory positions regarding the releases' severability and that these positions "cannot both be true." (Opp. at 19.)

17

In Appellant's telling, the Bankruptcy Court relied on the assertion of Appellee's counsel during the Confirmation Hearing that the Settlement Agreement's terms could easily unwind, with the remainder of the Plan continuing. (*Id.*) The releases' severability thus stands as a central issue here, militating against relying on equitable mootness to dismiss the Consolidated Appeals, as doing so would apply a knife, rather than a scalpel, to this matter. *In re Charter Commc'ns, Inc.*, F.3d 691 at 481–82.

Indeed, this Court already held in *Mahwah* that a nonseverability provision does not "constrain the ability to offer effective judicial relief" where releases involve claims that potentially stand "attenuated from the Bankruptcy Case." *Mahwah*, 636 B.R. at 698. Whether the Bankruptcy Court abused its discretion in entering the Settlement Order with these releases constitutes a critical question of the Consolidated Appeals, and thus the Court declines to conclude that effective judicial relief no longer qualifies as practically available here.

Lastly, before turning to the equitable mootness factors, the Court considers Appellant's argument that Appellee stands "judicially estopped" from arguing different positions during the 9019 Hearing and in its briefing for the pending Motion to Dismiss. (Opp. at 3.) As Appellee notes, the Fourth Circuit has held that courts should apply the judicial estoppel doctrine "with caution." (Appellee Reply Br. in Supp. of Mot. to Dismiss (ECF No. 40) ("Appellee MTD Reply") at 5, citing *Minnieland Private Day Sch., Inc. v. Applied Underwriters Captive Risk Assurance Co., Inc.*, 867 F.3d 449, 457 (4th Cir. 2017).) As *Minnieland* delineated, four elements must exist for a court to apply judicial estoppel: (1) "the party sought to be estopped must be seeking to adopt a position that is inconsistent with a stance taken in prior litigation;" (2) "the position sought to be estopped must be one of fact rather than law or legal theory;" (3) "the prior inconsistent position must have been accepted by the court;" and (4) "the party sought to be

18

estopped must have intentionally misled the court to gain unfair advantage." *Minnieland*, 867

F.3d at 458 (characterizing the fourth element as "determinative").

Here, Appellant argues that Appellee stands judicially estopped from arguing on appeal

that the Settlement Agreement terms cannot be undone, because Appellee's counsel told the

Bankruptcy Court during the 9019 Hearing that the terms of the Settlement could be unwound

without impairing the parties in the event of appellate reversal of the Settlement Order.  (Opp. at

3.)  But as Appellee points out, Appellee's counsel responded to a question from the Bankruptcy

Court about what would happen upon an adverse appellate ruling in the future, rather than taking

a position on an existing or historical fact.  (Appellee MTD Reply at 6–7.)

On this record and for two primary reasons, the Court finds that Appellee does not stand

judicially estopped.  First, Appellee's counsel responded to a question about interpreting the

effect of a potential legal ruling on the terms of a settlement, which strikes the Court as distinct

from taking an inconsistent position on a factual issue.  Second, and crucially, Appellant does not

persuade the Court that Appellee's counsel "intentionally misled" the Bankruptcy Court "to gain

unfair advantage" during the 9019 Hearing.  *Minnieland*, 867 F.3d at 458.  Accordingly, the

Court disregards Appellant's judicial estoppel argument and proceeds to applying the equitable

mootness factors to assess the Motion to Dismiss.

### 2.    Application of the Equitable Mootness Factors

Turning to the factors, on balance, they do not support a finding of equitable mootness,

and the Court will decline to exercise its discretion to avoid reviewing the merits of this appeal.

*See Behrmann*, 663 F.3d at 711 ("[W]hether a court should lend its aid in equity to a Chapter 11

debtor will turn on the particular facts and circumstances of the case . . . .")

###### a.   Stay

First, the Court notes that Appellant did not seek a stay pending appeal.  Where a party

makes a "strategic choice" not to seek a stay in a district court or bankruptcy court and thereby

allows a reorganization plan to go into effect, the party takes "the risks that attended such a

decision," weighing in favor of applying equitable mootness.  *Mac Panel Co. v. Va. Panel Corp.*,

283 F.3d 622, 625 (4th Cir. 2002); *see also In re U.S. Airways Grp., Inc.*, 369 F.3d 806, 809 (4th

Cir. 2004) (noting that appellant "sat idly by" while appellee "implemented its reorganization

plan by completing hundreds of transactions with third parties," and that as appellant "offered no

explanation for its failure" to seek a stay, the first factor weighed "strongly in favor of a finding

of equitable mootness").  Alternately, where a party seeks but fails to obtain a stay, the first

factor does not support dismissal of a bankruptcy appeal.  *Behrmann*, 663 F.3d at 713; *Mahwah*,

363 B.R. at 699.

After noticing appeals from the Settlement Order and Confirmation Order in September

and November of 2023, respectively, Appellant did not seek a stay of either Order from the

Bankruptcy Court or this Court.  Admittedly, Appellant stands in a different light from the party

in *U.S. Airways* that did not even *explain* its failure to seek a stay.  *U.S. Airways*, 369 F.3d at

809.  Here, Appellant argues that it did not seek a stay on account of the Settlement Order's

provision that the Settlement Agreement would not become effective until the Settlement Order

qualified as "final and non-appealable."  (Opp. at 2, quoting (ECF No. 13-26 at 4).)  Appellant

also points to the statements of Appellee's counsel during the Confirmation Hearing that, in the

event of reversal of the Settlement Order, the Plan could smoothly continue.  (Opp. at 24.)  To

Appellant, these statements — along with the Settlement Order's text noted *supra* — justified its

failure to seek a stay pending appeal.  (*Id.*)

The Court disagrees.  If the Settlement Order's language noting that the Settlement Agreement would not become effective until the Settlement Order qualified as "final and non-appealable" sufficed to justify a party in not seeking a stay, then this factor would lose all value in an equitable-mootness analysis, because parties generally possess a right to appeal bankruptcy courts' settlement orders.  Taking Appellant's position, a party could simply point to a bankruptcy court's reference to an order taking effect when it becomes "non-appealable" and sit "idly by" as a party "implemented its reorganization plan." *U.S. Airways*, 369 F.3d at 809–10.

Yet even so, Appellant *has* presented some evidence that it reasonably assumed, based on its interpretation of the statements that Appellee's counsel made during the Confirmation Hearing, that reversal of the Settlement Order would not "extinguish old rights and create new ones." *Mac Panel*, 283 F.3d at 625.  Accordingly, the first factor weighs in favor of equitable mootness, though less heavily than in situations where a party offered no reasonable justification for its failure to seek a stay. *Cf. U.S. Airways*, 369 F.3d at 809 (appellant "offered no explanation for its failure" to seek a stay).

### b.   Substantial Consummation

As to the second factor — whether the reorganization plan or other equitable relief has been substantially consummated — Chapter 11 of the Bankruptcy Code defines "substantial consummation" as:

> (A) transfer of all or substantially all of the property proposed by the plan to be transferred;
>
> (B) assumption by the debtor or by the successor to the debtor under the plan of the business or of the management of all or substantially all of the property dealt with by the plan; and
>
> (C) commencement of distribution under the plan.

11 U.S.C. § 1101(2).

21

Here, Appellee argues that the relief that Appellant seeks would unwind key parts of the

Plan, to the detriment of third parties, as the Settlement Agreement has been fully consummated.

(Mem. at 22–24.) Pointing to William Schettine's payment of $1.6 million to Appellee's estate

and funding of another $1 million of Plan Collateral on November 30, 2023, along with the

distribution of more than $1 million to the holders of allowed administrative claims, secured

claims, priority claims and unsecured claims, Appellee notes that more than twenty-three parties

have already received a distribution from the estate. (*Id.* at 22.) Appellee adds that as of the

Effective Date (i.e., November 30, 2023), (1) its status changed from a debtor in possession to

the "Reorganized Debtor," and (2) pursuant to the Confirmation Order, all assets of the estate

vested in it. (*Id.* at 22–23, citing No. 23-31377 (Bankr. E.D. Va. Nov. 15, 2023), ECF Nos. 300,

368.) Moreover, Appellee highlights that as of the Effective Date, all pre-bankruptcy (or

prepetition) claims and causes of action that once belonged to Appellee transferred to the

Litigation Trust for resolution, and that Appellee's estate has already transferred $75,000 to the

Litigation Trust. (*Id.* at 23.) Because the Bankruptcy Court granted Appellee's motion for relief

and then entered the Confirmation Order, the Plan went effective, and relief has thereby been

substantially consummated, in Appellee's telling. (*Id.* at 23–24.)

But substantial consummation of the Plan does not necessarily "render it inequitable to

rule on this appeal." *Mahwah*, 363 B.R. at 699. Indeed, courts have expressed concern

regarding debtors' rush to implement reorganization plans as a cudgel against proper appellate

review. As Third Circuit Judge Cheryl Krause observed in reflecting on the judge-made doctrine

of equitable mootness:

> The doctrine was intended to promote finality, but it has proven far more likely to
> promote uncertainty and delay. Ironically . . . a motion to dismiss an appeal as
> equitably moot has become "part of the Plan." Proponents of reorganization plans
> now rush to implement them so they may avail themselves of an equitable mootness

defense, much like Appellees did here. Rather than litigate the merits of an appeal, parties then litigate equitable mootness. And even if an appeal is dismissed as equitably moot by a district court, that dismissal is appealed to our Court, often resulting, in turn, in a remand and further proceedings.

*In re One2One Comm'ns, LLC*, 805 F.3d 428, 446–47 (3d Cir. 2015) (Krause, J., concurring in reversal of district court's equitable mootness dismissal and remand for consideration of bankruptcy appeal on the merits). Consequently, "[i]n many cases, district courts may conclude that all or substantially all of the relief requested is feasible *despite the plan's consummation.*" *In re VeroBlue*, 6 F.4th at 890 (quoting *In re One2One Comm'ns*, 805 F.3d at 450) (emphasis added).

Such is the case here, where Appellant points to statements by Appellee's counsel during the Confirmation Hearing that no "toggle" would be necessary in the Plan, because certain terms could unwind upon appellate reversal of the Settlement Order. No. 23-31377 (Bankr. E.D. Va. Nov. 15, 2023), ECF No. 386 at 128–30. In light of the Bankruptcy Court's confirmation of the Plan shortly following the Confirmation Hearing, the Court is left with doubts as to whether all or substantially all of the relief requested remains feasible despite the Plan's consummation. Moreover, Appellant had already noticed its appeals from the Settlement Order and Confirmation Order by the Effective Date, injecting further uncertainty as to the ultimate resolution of the Bankruptcy Court's determinations.

This fact pattern therefore strikes the Court as precisely the sort of situation that *In re VeroBlue* and *In re One2One* considered: where "[p]roponents of reorganization plans now rush to implement them so they may avail themselves of an equitable mootness defense," rather than litigating the merits of an appeal. *In re VeroBlue*, 6 F.4th at 889–90. Admittedly, substantial consummation suffices "to justify dismissing an appeal when either 'the remedy sought will affect the success of the plan' or substantially 'alter the rights of third parties' not before the

23

court." *Wilmington Tr., Nat'l Ass'n v. Lord & Taylor LLC*, 2021 WL 3089105, at *8 (E.D. Va.

July 22, 2021) (citing *Mac Panel*, 283 F.3d at 626). But here, whether the sought-after remedy

will affect the success of the Plan constitutes a key question on appeal, as Appellant and

Appellee present clashing interpretations of what would happen to the Plan's releases and other

terms upon reversal of the Settlement Order.

The Court acknowledges that Appellee has engaged in numerous transactions as of the

Effective Date. But doing so does not shield Appellee and Intervenors from appellate scrutiny,

however much they wish to leverage equitable-mootness grounds as a defensive mechanism

against litigating the merits. This factor therefore leans against equitable mootness.

c.     <strong>Success of the Reorganization Plan and Third-Party Interests</strong>

Turning to the third and fourth factors, the Court considers the extent to which the relief

requested on appeal would affect the success of the reorganization plan or other equitable relief

granted or would affect the interests of third parties. To Appellee, numerous harms would spring

forth if the Court were to grant Appellant's requested relief, endangering the success of the Plan

and harming third parties: (1) the DIP Lender's counsel would have to disgorge $200,000 of

payments that it received from Appellee's estate, which would then have to return this total to

William Schettine, because he constitutes the Plan Sponsor; (2) the original amount of William

Schettine's secured claim of $1.16 million would be reinstated from its amended amount of

$500,000, resulting in twenty-one unsecured creditors who received a distribution having to

disgorge these payments for the benefit of higher-priority, secured creditors; (3) similarly,

William Schettine's *unsecured* claim would increase from $100,000 to $720,000, again requiring

third parties to disgorge payments that they already received; (4) the estate's releases of claims

against Intervenors would be rescinded, which Appellee argues would undermine the Plan,

24

because the releases constituted a key reason why William Schettine, as the Plan Sponsor, contributed more than $1 million to the estate's payments to allowed claim holders. (Mem. at 24–26.)

But the Court again notes that Appellee's parade of horribles stands in contrast with what Appellee's counsel told the Bankruptcy Court during the Confirmation Hearing:  that the Plan did not require any "toggle" language to account for the possibility of reversal of the Settlement Order, because the "plan is structured in a way where you don't need a toggle," and "it's not like there's a financial burden created in the event that that appeal is successful."  No. 23-31377 (Bankr. E.D. Va. Nov. 15, 2023), ECF No. 386 at 128–30.  For Appellee's counsel to now assert that a cascade of harm to third parties and to the Plan's odds of success would fall if the Court were to reverse the Settlement Order and Confirmation Order appears to be an about-face timed to maximize the chance of shutting down appellate review via application of the equitable-mootness doctrine.  While the Court has rejected Appellant's judicial-estoppel argument as a sufficient basis for denying the Motion to Dismiss, the Court therefore nonetheless observes that Appellee has presented plausibly conflicting narratives about the success of the Plan in the event of appellate reversal.  And notably, the Bankruptcy Court appears to have made a conscious choice *not* to immunize the terms of the Settlement Agreement from appellate review, declining to adopt language that Appellee had proposed for the final Confirmation Order that stated, in part, the following:

> [R]eversal, stay, modification, or vacatur shall not affect the validity or enforceability of any act, obligation, indebtedness, liability, priority, or Lien incurred or undertaken by the Debtor, the Reorganized Debtor, or any other party authorized or required to take any action in connection with the Plan, as applicable, prior to the effective date of such reversal, stay, modification, or vacatur. Notwithstanding any reversal, stay, modification, or vacatur of this Confirmation Order, any act or obligation incurred or undertaken pursuant to, or in reliance on, this Confirmation Order prior to the effective date of such reversal, stay,

> modification, or vacatur shall be governed in all respects by the provisions of this Confirmation Order, the Plan, the Plan Supplement, or any amendments or modifications to the foregoing.

No. 23-31377 (Bankr. E.D. Va. Nov. 14, 2023), ECF No. 367, ¶ 45. As Appellant notes, the apparently purposeful omission of this proposed immunizing language suggests that the Bankruptcy Court intended the Plan's terms to be reviewable by this Court. (Opp. at 25.)

To be sure, various third parties would have to disgorge payments for the benefit of secured creditors with higher-priority claims. But just because Appellee and Intervenors "rush[ed] to implement [the Plan's terms] so they may avail themselves of an equitable mootness defense," *In re One2One Comm'cns, LLC*, 805 at 446–47, does not throw the third and fourth factors to Appellee. *See In re VeroBlue Farms USA, Inc.*, 6 F.4th at 890 (observing that upon reversal of a confirmed plan on the merits, "the district court may be able to fashion effective relief for those whose rights were impaired by the plan even if the business assets have been sold to a third-party purchaser relying on the confirmed plan, such as disgorgement of the proceeds").

While this situation obviously does not constitute an ideal outcome for the third parties that already received payments from the estate, the record does not reflect that disgorgement of the payments that third parties received qualifies as impracticable. Furthermore, the decision by the DIP Lender's counsel to accept the $200,000 payment that William Schettine remitted came amid an ongoing appeal of the Settlement Agreement to this Court. The Court will not allow interested parties, such as the DIP Lender's counsel, to rush through payments during the appeal process and then point to these rushed payments as evidence for why irreparable harm would occur upon reversal of the Plan, when the parties knew of the uncertain nature of these appeals.

Lastly, Appellee rightly notes important differences between this case and *Mahwah*, as the instant appeals do not concern sweeping releases extinguishing the claims of absent and

26

nonconsenting parties, nor do they feature objections from the Office of the United States Trustee. (Mem. at 27–28, citing *Mahwah*, 636 B.R. at 697–8.)  But while this case stands distinguishable from an even more clear-cut instance in which equitable mootness did not apply, Appellee has failed to carry its burden to demonstrate that the Court should dismiss the appeals due to equitable mootness.  Although Appellant's persistent objections have made life difficult for Appellee and the Intervenors, Appellant's litigiousness does not rise to the level of bad faith, considering the size of its unsecured claim and its natural interest in preserving its legal rights.

In sum, this case does not present the "extremely rare circumstances" in which the Court should decline to perform its "unflagging obligation" to exercise appellate jurisdiction over a bankruptcy proceeding in which a party asserts that a confirmation order has injured its rights. *Id.* at 891.  The Court will therefore DENY Appellee's Motion to Dismiss, (ECF No. 27), and proceed to considering the merits of the Consolidated Appeals.

### B.    Merits of the Appeals

Appellant presents two questions to the Court:  whether the Bankruptcy Court abused its discretion in (1) entering the Settlement Order and in (2) entering the Confirmation Order incorporating the terms of the Settlement Agreement when the Settlement Order stood subject to appeal.  (Appellant's Consolidated Opening Brief (ECF No. 33) ("Appellant Br.") at 5.)  At the heart of the Consolidated Appeals lies Appellant's objection to the Settlement's release of Appellee's claims against Intervenors, as Appellant contends that these releases discard valuable claims against company insiders that could otherwise be available to unsecured creditors, including Appellant.  (*Id.* at 2.)

Arguing that the Bankruptcy Court erred in entering the Settlement Order and Confirmation Order, Appellant points to the testimony of Appellee's two witnesses during the

27

August 23, 2023 evidentiary hearing (the "9019 Hearing") who, in Appellant's view, failed to offer testimony that supported the requisite factors that Federal Rule of Bankruptcy Procedure 9019 provides for evaluating a proposed release and settlement of estate claims. (*Id.*) These factors, referred to as the *Austin* factors, include (1) the probability of success in any ensuing litigation; (2) any collection difficulties; (3) the complexity, likely duration and expense of the litigation; and (4) whether the proposed compromise qualifies as fair and equitable to a debtor, the creditors and other interested parties. *Fetner v. Hotel St. Cap., L.L.C.*, 2021 WL 1022585, at *3 (E.D. Va. Feb. 5, 2021), *aff'd*, 2021 WL 4922324 (4th Cir. Oct. 21, 2021) (citing *In re Austin*, 186 B.R. 397, 400 (Bankr. E.D. Va. 1995)); *see also In re Three Rivers Woods, Inc.*, 2001 WL 720620, at *6 (Bankr. E.D. Va. Mar. 20, 2001) (calling the *Austin* factors "the basic criteria for consideration of a motion to approve a compromise and settlement" within this District).

In Appellant's view, the independent manager of Appellee failed to identify the claims that the Settlement would release, but the Bankruptcy Court nonetheless summarily approved the Settlement. (Appellant's Br. at 2.) Furthermore, Appellant argues that the Bankruptcy Court improperly admitted into evidence an expert report, "allowed non-parties to the contested matter to examine witnesses and argue" during the hearing, "transmuted judicially noticed documents into substantive evidence[] and entered a post-appeal opinion while lacking jurisdiction to do so." (*Id.* at 2–3.) And turning to the Bankruptcy Court's confirmation of the Plan, Appellant asserts that the Bankruptcy Court approved the Plan based on representations by Appellee's counsel that the Settlement's terms could simply be undone if the Settlement Order faced reversal on appeal. (*Id.* at 3–4.)

Lastly, Appellant argues that the Bankruptcy Court lacked jurisdiction to enter its Settlement Opinion on October 6, 2023, because the opinion issued *after* Appellant had already

filed its Notice of Appeal of the Settlement Order on September 11, 2023. (*Id.* at 39.)  To

Appellant, the filing of the appeal stripped the Bankruptcy Court of jurisdiction to enter the

subsequent opinion. (*Id.* at 39–40, quoting *In re Whispering Pines Estates, Inc.*, 369 B.R. 752,

757-59 (B.A.P. 1st Cir. 2007), for the rule that "[i]t is well established that the filing of a notice

of appeal is an event of jurisdictional significance in which a lower court loses jurisdiction over

the subject matter involved in the appeal").

     The Court first considers the threshold issue of jurisdiction before turning to whether the

Bankruptcy Court abused its discretion in entering the Settlement Order, and then weighs

whether the Bankruptcy Court abused its discretion in entering the Confirmation Order when the

Settlement Agreement lay subject to appeal.

### 1.   Jurisdiction to Issue Settlement Opinion

     The Fourth Circuit does not appear to have conclusively resolved whether a bankruptcy

court maintains jurisdiction to issue a memorandum opinion in a case that lies on appeal before a

federal district court.  And undoubtedly, "[t]he general rule is that the filing of a timely and

sufficient notice of appeal immediately transfers jurisdiction of all matters relating to the appeal

from the district court to the court of appeals." *In re Grand Jury Proceedings Under Seal v.

United States,* 947 F.2d 1188, 1190 (4th Cir.1991).  However, lower courts retain jurisdiction to

issue further rulings when, among other exceptions, their subsequent actions would aid in

resolution of the appeal. *Id.*  Appellee argues that this exception applies to the Settlement

Opinion, because the Bankruptcy Court's explanation of its reasoning would aid this Court in

resolving the instant appeal. (Appellee's Br. (ECF No. 42) at 46.)

     In the absence of a bright-line rule regarding the Bankruptcy Court's jurisdiction to enter

a memorandum opinion after the noticing of an appeal, the Court observes that multiple district

courts within the Fourth Circuit have considered bankruptcy courts' post-appeal memorandum opinions. *See, e.g., Howes v. Wells Fargo Bank, N.A.*, 2015 WL 5836924, at *3 n.10, *15 (D. Md. Sept. 30, 2015), *aff'd in part, remanded in part*, 676 F. App'x 207 (4th Cir. 2017) (observing that bankruptcy court filed a memorandum opinion after the noticing of appeal and acknowledging that the Fourth Circuit's *In re Grand Jury Proceedings* holding allows post-appeal rulings that would aid the appellate court's decisional process); *In re Holder*, 94 B.R. 394, 394 (M.D.N.C. 1988), *aff'd*, 892 F.2d 29 (4th Cir. 1989) (noting that a party "filed notice of appeal on April 4, 1988, and the bankruptcy court issued a memorandum opinion on April 29, 1988"). In fact, a court within this District has taken judicial notice of a bankruptcy court's memorandum opinion setting forth its factual findings and legal conclusions even when "neither the appellant nor the appellee included the bankruptcy court's memorandum opinion in its designation of the record on appeal." *In re Sohail*, 438 B.R. 398, 401 n.1 (E.D. Va. 2010).

Upon review, the Court finds that the Settlement Opinion would aid in its decisional process by setting forth the Bankruptcy Court's justifications for its approval of the Settlement. Accordingly, the Bankruptcy Court maintained jurisdiction to enter the Settlement Opinion, and the Court considers its reasoning in ruling on these Consolidated Appeals.

### 2. Settlement Order

Reviewing the Bankruptcy Court's legal conclusions *de novo* and its factual findings for clear error, *Mar-Bow Value Partners*, 578 B.R. at 328, the Court assesses whether the Bankruptcy Court properly applied the *Austin* factors in approving the Settlement. As a threshold matter, the Court observes that bankruptcy law generally favors settlements, and "the bankruptcy court can approve a compromise over objections so long as the compromise does not fall[] below the lowest point of reasonableness." *Dale v. Butler*, 2020 WL 6817059, at *7

(E.D.N.C. Nov. 18, 2020), *aff'd*, 2021 WL 3783111 (4th Cir. Aug. 26, 2021); *United States ex rel. Rahman v. Oncology Assocs., P.C.*, 269 B.R. 139, 149–50 (D. Md. 2001), *aff'd*, *United States ex rel. Rahman v. Colkitt*, 61 Fed. Appx. 860 (4th Cir. 2003) (same).

### a.   Probability of Success in Ensuing Litigation

The Court first looks at whether the Bankruptcy Court properly considered "the probability of success the estate would have if it pursued collection of its claim in an adversary proceeding against the likelihood that the estate would realize substantially less than the amount of a judgment for its claim, instead of settling the claim." *In re CEI, LLC*, 2019 WL 914131, at *6 (W.D.N.C. Feb. 25, 2019), *aff'd*, 799 F. App'x 211 (4th Cir. 2020) (characterizing this *Austin* factor as "[p]erhaps the most important factor in determining the adequacy of a proposed settlement"). The Bankruptcy Court noted that (i) the MorrisAnderson Report concluded that the Intervenors' exposure was "confined to" William Schettine, who stands exposed to a total $800,000 in avoidable-transfer claims, and (ii) the Settlement Agreement provides for an initial lump sum payment of $200,000 by William Schettine to the bankruptcy estate, a reduction of his asserted secured claim of $1.16 million to a $500,000 allowed secured claim and a reduction of his asserted unsecured claim from $720,000 to $100,000. (Bankr. Mem. Op. at 15.) In terms of the probability of success in any ensuing litigation, the Bankruptcy Court stated that the Intervenors had asserted defenses to avoidance and recovery of the transfers at issue, observing that counsel for William Schettine stated during the 9019 Hearing that "his clients intended to mount a vigorous, multi-faceted defense should litigation be brought against them by" Meridien. (*Id.* at 15 n.14.)

If litigation were to proceed in lieu of settlement, in the Bankruptcy Court's view, Meridien would face uncertain odds of gaining any additional net recovery for the estate, while

31

the cash component of the Settlement (along with the reduction in William Schettine's claims)

would yield a value to the estate that approaches Meridien's $800,000 estimate of its maximum

potential recovery against William Schettine.  (*Id.* at 16.)  To the Bankruptcy Court, the amount

of the Settlement, when considering the time and expense of any alternative litigation,

constituted a net benefit to the estate, such that the probability of success in ensuing litigation did

not weigh against the Settlement.  (*Id.*)

Arguing that the Bankruptcy Court erred in analyzing this *Austin* factor, Appellant asserts

that Appellee failed to even identify the particular claims that the Settlement covered as to each

Intervenor, much less address Appellee's ability to prevail in litigation on these claims or assess

Intervenors' prospective defenses. (Appellant Br. at 26.)  Pointing to Appellee's two witnesses

who testified during the 9019 Hearing, Appellant highlights that Welch, who prepared the

MorrisAnderson Report, stated that he did not have an opinion as to the probability of success on

the claims, and that Rose (Appellee's Independent Director) testified that Appellee "didn't

contemplate estimating" the probability of success of the claims against the Intervenors.  (*Id.*,

citing the 9019 Hearing transcript.)  Appellant also highlights that Appellee's 2018–2019

financial statements revealed an approximate $1.2 million reduction (measured from December

31, 2018 to December 31, 2019) in an amount owed by William Schettine to Appellee, and that

Appellee failed to explain this reduction to the Bankruptcy Court.  (*Id.* at 27–28.)

When reviewing settlement agreements' adequacy, "courts have acknowledged the

wisdom of settling those claims for which proper resolution is disputed in the case law, or the

diminished ability to collect."  *In re CEI*, 2019 WL 914131, at *6.  But the record by which the

Bankruptcy Court determined that the probability of success in any ensuing litigation supported

approval of the Settlement Agreement strikes this Court as relatively scant.  As Appellant notes,

Appellee failed to identify the particular claims that the Settlement covered (or explain the $1.2 million reduction in the amount that William Schettine owed, as reflected by the 2019 financial statement), and its witnesses for the 9019 Hearing did not elaborate on the probability of success in litigation.

In their own brief, Intervenors contend that "during the 5-year lookback period, a total of $27,553,419 was transferred to [Appellee] by Mr. Schettine and during the same time Mr. Schettine and the other Defendants received only $11,587,404 from" Appellee. (Intervenors' Resp. to Appellant's Br. (ECF No. 43) ("Intervenors' Resp.") at 10–11.) But while Intervenors apparently seek to imply that Appellee faces long odds in recovering from William Schettine on account of these alleged contributions that he made, their argument — made for the first time in their response brief, rather than during the 9019 Hearing or at another time — stands untimely. *See Altemus v. Med. College of Virginia Hosp.*, 23 Fed.Appx. 158, 159 (4th Cir. 2001) ("Arguments raised for the first time on appeal are generally deemed waived, except where refusal to consider the issue would be plain error or result in a fundamental miscarriage of justice."). The Court thus does not consider Intervenors' argument about these alleged contributions.

The Court emphasizes that while "the bankruptcy court must examine the probability of success in litigation, it does not need to address or resolve the merits of the claims at issue in the case." *Van Wagner v. Atlas Tri-State SPE, LLC*, 2012 WL 1636857, at *6 (N.D.W. Va. May 8, 2012) (citing *In re Final Analysis, Inc.*, 417 B.R. 332, 342 (Bankr. D. Md. 2009)). The Bankruptcy Court does not need to conduct a "mini trial," *In re WorldCom, Inc.*, 347 B.R. 123, 137 (Bankr. S.D.N.Y. 2006), and instead must "only canvass the issues to determine if the settlement falls below the lowest point in the range of reasonableness," *In re Gordon Properties,*

*LLC*, 515 B.R. 454, 465 (Bankr. E.D. Va. 2013). At the same time, however, the Bankruptcy

Court must look under the hood of the settlement vehicle, for "[t]here can be no informed and

independent judgment as to whether a proposed compromise is fair and equitable until the

bankruptcy judge has apprised himself of all facts necessary for an intelligent and objective

opinion of the probabilities of ultimate success should the claim be litigated." *Protective*

*Committee for Independent Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414,

424–25 (1968) (further opining that "[t]he fact that courts do not ordinarily scrutinize the merits

of compromises involved in suits between individual litigants cannot affect the duty of a

bankruptcy court to determine that a proposed compromise forming part of a reorganization plan

is fair and equitable").

     Of central concern, the Court draws attention to the 9019 Motion's failure to even

identify the claims that the Settlement would resolve against each of the Intervenors, and Rose's

inability during the 9019 Hearing to identify a single claim. (Appellant Br. at 26, citing the 9019

Hearing transcript.) And while Intervenors' counsel posited their intent to mount a "vigorous,

multi-faceted defense" against potential claims, (Bankr. Mem. Op. at 15 n.14), this statement —

stripped of analysis regarding the specific defenses, save for a passing mention of "exchanges of

contemporaneous and subsequent new value," (*id.* at 7), — seems like a generic remark to be

expected of counsel representing a client's interests during a settlement approval hearing. In

addition, even Appellee's brief acknowledges that "MorrisAnderson did not evaluate" the

Intervenors' defenses, further depriving the Bankruptcy Court of information on the particular

claims at issue.  (Appellee's Consolidated Opening Brief (ECF No. 42) ("Appellee Br.") at 30.)

Other courts have done more work on the first *Austin* factor.[10]

The Court acknowledges that Appellant's expert witness, Jeremiassen, did not identify

any specific claims for breach of fiduciary duty or breach of contract, testified that additional

work would need to occur for a proper analysis and estimated that doing so would take between

fifty and 100 hours and cost $40,000 to $80,000, "depending on the availability of information

---

[10]     *See, e.g., In re LeClairRyan PLLC*, 2022 WL 2346849, at \*10 (Bankr. E.D. Va. June 28,
2022) (noting that settlement involved release of "thirty-four counts, ranging from violations of
the VUTSA to conspiracy and breaches of fiduciary duty," that would entail "complex, fact-
intensive inquiries" and concluding that probability of success in any ensuing litigation "was by
no means certain" and thus weighed in favor of settlement); *Fetner*, 2021 WL 1022585, at \*3
(finding that bankruptcy court did not abuse its discretion in approving settlement where, among
other analyses, it reviewed evidence that trustee and counsel "conducted a thorough investigation
of the claims and causes of action, including legal research, review of records, discussions with
the Debtor, and interviews and meetings with the defendants and their counsel" and "gave due
consideration to the strengths and weaknesses of the case"); *In re Health Diagnostic Lab'y, Inc.*,
No. 15-32919, 2016 WL 6068812, at \*4 (Bankr. E.D. Va. Oct. 14, 2016) (noting evidence that
parties discussed the potential of "factually complex litigation" involving claims for intentional
and constructive fraudulent conveyances, avoidance actions, unlawful distribution to
shareholders, breach of fiduciary duty, common law conspiracy and statutory conspiracy and
legal malpractice, and observing that trustee "assessed the various defenses" that debtor would
likely raise, including "challenges presented by the standard of care, proximate cause,
contributory negligence and the *in pari delicto* doctrine"); *In re Loudoun Heights, LLC*, 2014
WL 2928110, at \*9–10 (Bankr. E.D. Va. June 27, 2014) (finding that as one party maintained
"more than a good faith argument" regarding its interest in a particular asset at issue, litigation
could ensue in which the party would have "more than a fair probability of success,"); *In re
Barnwell Cnty. Hosp.*, 491 B.R. 408, 418 (Bankr. D.S.C. 2013) (finding that where issues in
dispute "involve a myriad of factual issues that would require multiple depositions, lengthy
written discovery, engagement of experts, and possibly a lengthy trial", this factor weighed
toward approving settlement); *Van Wagner*, 2012 WL 1636857, at \*7 (observing that the
"Bankruptcy Court analyzed **each of the appellant's claims** from the first and second state civil
cases and stated that it was 'not convinced that the trustees would be better guided litigating the
causes of action'") (emphasis added);  *In re Magna Corp.*, 2003 WL 22078082, at \*4 (Bankr.
M.D.N.C. Aug. 29, 2003) (analyzing particular claims at issue); *see also Depoister v. Mary M.
Holloway Found.*, 36 F.3d 582, 587 (7th Cir. 1994) (holding that courts must "actually exercise
discretion and not simply rubber stamp the . . . proposal," and bankruptcy judge's "**familiarity
with the individual claims** . . . supports his conclusions as to the merits of each of the claims")
(emphasis added).

and records." (Bankr. Mem. Op. at 13.) Jeremiassen also did not dispute Appellee's contention that it lacks sufficient funds to conduct a more extensive analysis or that it lacks the resources to remain in bankruptcy for an extended time. (*Id.*) Considering these difficulties, the Court recognizes that an *exhaustive* analysis of Appellee's potential claims against the Intervenors may constitute a futile or unfulfilling exercise.

Yet just because the expert witness of an *objector* could not identify claims does not let the Bankruptcy Court off the hook. As noted, in reviewing a settlement, bankruptcy courts have determined that "a myriad of factual issues" could come into play in ensuing litigation. *In re Barnwell*, 491 B.R. at 418. While the Bankruptcy Court did not need to conduct a "mini trial," *In re WorldCom*, 347 B.R. at 137, it should not have made a legal conclusion on this factor without concrete evidence of any specific claims against the Intervenors. *Cf. In re CEI*, 2019 WL 914131, at *7–8 (finding that bankruptcy court did not abuse its discretion in finding that probability of success on claims "was anything but a certainty" when record included (1) answers from would-be defendants, (2) a transcript of a meeting with creditors and (3) "a chart detailing alleged avoidable transfers," thereby presenting "the amount of the claim and allegations concerning the conduct which informed the [] pursuit of that claim").

"In order to appropriately exercise its discretion in making an independent evaluation, a bankruptcy court must have sufficient information about the settlement from which to make a knowledgeable decision." *Id.* at *7. But based on Appellee's lack of an explanation regarding the specific potential claims at issue, along with the unexplained reduction in William Schettine's amount owed to Appellee as reflected in Appellee's 2018–2019 financial statements, the record stands bereft of sufficient information regarding the probability of success that

36

Appellee would face in any litigation arising from these claims.[11]  While success in most litigation qualifies as uncertain, the absence of evidence on this factor leads the Court to conclude that the Bankruptcy Court erred in determining that the factor, "[p]erhaps the most important" one, *In re CEI*, 2019 WL 914131, at *6, weighed toward approving the Settlement Agreement.

### b.  Difficulties of Collection

As to the second *Austin* factor, the Bankruptcy Court found that "the cash component of the proposed settlement coupled with the substantial reduction in" William Schettine's claims yielded a value to the bankruptcy estate that approximated Appellee's estimated maximum potential recovery from William Schettine. (Bankr. Mem. Op. at 16–17.)  Conceding that Appellee "did not offer direct evidence of the potential difficulty in collection were litigation to ensue and the Debtor prevail," the Bankruptcy Court nonetheless found that because the proposed settlement offer approached the potential maximum recovery, this factor carried little weight here.  (*Id.*)

On appeal, Appellant argues that the Bankruptcy Court erred in this conclusion, emphasizing the paucity of evidence regarding Appellee's ability to collect against each of the Intervenors, as neither of Appellee's 9019 Hearing witnesses (Rose and Welch) offered an opinion on this *Austin* factor.  (Appellant Br. at 29–30.)

The Court understands the Bankruptcy Court's supposition that because a theoretical victory for Appellee in litigation would result in a maximum recovery that approximates the

---

[11]      The Bankruptcy Court noted that "Rose testified that formulation of the initial demand included claims for excess compensation, and that Debtor's counsel was unable to identify any potential breach of fiduciary duty claims." (Bankr. Mem. Op. at 11 n.8) (internal citations omitted).  However, this passing reference stands out as the only inquiry in the Bankruptcy Court's Settlement Opinion as to the nature of the claims.

Settlement offer, the collection-difficulties factor carries less importance here.  In essence, the Bankruptcy Court posits that since the Settlement presents a near-comparable payment for Appellee regarding potential claims against the Intervenors, Appellee's ability to collect on claims after successful litigation matters little, as Appellee would be able to recover a similar amount under the Settlement.  But as the Bankruptcy Court itself noted, "collectability presumes that the Debtor would prevail in litigation." (Bankr. Mem. Op. at 16.)  Where the record reflects little analysis into the underlying claims against Intervenors and thus an insufficiently concrete examination of the probability of success in litigation, the Court stands unpersuaded by the Bankruptcy Court's legal conclusion that this factor constitutes a nonissue here.  Indeed, bankruptcy courts still inquire about collection difficulties even where a proposed settlement would likely "net more funds to the estate than would continued litigation." *In re CEI*, 2019 WL 914131, at *6 (finding a "slim" possibility of collection and that "[a]ny collection effort would be expensive in terms of attorney fees and court costs, time-consuming, and likely to net less to the estates than the proposed Settlement").

c.      **Complexity, Duration and Expense of Litigation**

Next, the Bankruptcy Court found that the complexity of the litigation supported approving the Settlement, based on the testimony of Welch and Jeremiassen, "voluminous exhibits" and extensive litigation that surrounded approval of the Settlement. (Bankr. Mem. Op. at 17.)  Describing the expense, inconvenience and delay that would ensue upon rejection of the Settlement as "perhaps the most significant factor supporting approval," the Bankruptcy Court found that Appellee had repeatedly underscored its inability to remain in a state of bankruptcy for an extended time and that Appellant had engaged in extensive litigation with Appellee in the runup to approval of the Settlement. (*Id.*)  While recognizing that Appellant qualifies as

38

Appellee's largest unsecured creditor and therefore maintains a legitimate interest in maximizing its recovery, the Bankruptcy Court credited Appellee's complaints about Appellant's aggressive litigation tactics and found that approval of the Settlement would minimize further expenses, inconvenience and delay associated with Appellee remaining in Chapter 11 status. (*Id.* at 18–19.)

The Bankruptcy Court thus focused its analysis on this factor on the complex and long-running litigation between Appellee and *Appellant*, rather than assessing how onerous litigation could be between Appellee and the *Intervenors*. The record no doubt reflects that Appellee and Appellant have engaged in a prolonged spat. But the third *Austin* factor generally concerns the complexity and costs of litigation that, in the absence of a proposed settlement, could arise, rather than concerning litigation between a debtor and objecting creditor. *See, e.g., In re CEI*, 2019 WL 914131, at *6 ("The costs of the litigation would have been large due to the complexity of the claims and **the claims'** fact-specific nature.") (emphasis added). To concentrate on Appellant's litigiousness with Appellee presents, as Appellant notes, a red herring. (Appellant's Reply Br. (ECF No. 44) ("Appellant Reply") at 12.) Indeed, given the pendency of MarkWest's appeal before this Court when the Bankruptcy Court issued its Memorandum Opinion, the logical fallacy of focusing on Appellant's litigiousness jumps out even more clearly. Appellant, as an objecting creditor, had been and was continuing to litigate its quarrel with Appellee. Approval of the Settlement would not snuff out *that* litigation, but rather prospective litigation with Intervenors.

Because Appellee failed to offer sufficient evidence as to the complexity of costs of attendant litigation with *Intervenors*, the Bankruptcy Court erred in finding that this factor favored approval of the Settlement.

### d.      Fairness to Debtor, Creditors and Interested Parties

Turning to the fourth *Austin* factor, the Bankruptcy Court acknowledged that MarkWest constituted the largest unsecured creditor but noted that other creditors possessed substantial claims against Meridien, with MarkWest standing as the sole creditor objecting to the Settlement. (Bankr. Mem. Op. at 19, noting the Internal Revenue Service's priority unsecured claim for $93,463.54 and McGuireWoods LLP's filing of an unsecured claim for $800,734.21.) Stating (in conclusory fashion, without analysis) that Meridien would incur substantial costs in litigating against the Intervenors and noting that administrative and taxing authority creditors possess priority over MarkWest, the Bankruptcy Court concluded that "the paramount interest of the general creditor body" favored approval of the Settlement. (*Id.*)

To the Bankruptcy Court, Appellant's objection largely constitutes speculation, as Appellant could not specify a claim that MorrisAnderson failed to identify. (*Id.*) Furthermore, the Bankruptcy Court rejected Appellant's critique of MorrisAnderson's reliance on audited CPA reports and other financial data and of Rose's performance of his duties as Independent Director in evaluating Appellee's claims. (*Id.* at 20.) MorrisAnderson's focus on bank statements, tax returns, independent CPA reports and financial information other than Appellee's QuickBooks ledgers (which MorrisAnderson deemed to be unreliable) constituted a reasonable decision, in the Bankruptcy Court's view. (*Id.* at 20–21.) The Bankruptcy Court also found that Rose satisfactorily performed his Independent Director role by overseeing the process, considering professionals' advice and independently determining whether to accept the Settlement. (*Id.*)

Appealing the Bankruptcy Court's findings on this factor, MarkWest highlights its status as the largest unsecured creditor and holder of approximately 96 percent of the total dollar value

40

of general unsecured claims. (Appellant Br. at 31.) Appellant also points out that Welch limited his investigation concerning money that the Intervenors may have owed Meridien to potential cash fraudulent transfers and preference claims, as he did not investigate potential claims for breach of contract, receivables collection, substantive consolidation, alter ego, breach of fiduciary duty or malpractice, nor did he examine cash transfers outside of Meridien's bank accounts. (*Id.* at 32, citing 9019 Hearing Transcript.) On that basis, and as the Settlement releases Intervenors from *any and all* claims that Appellee could have against them, Appellant raises legitimate issues as to whether MorrisAnderson's investigation properly examined the scope of potential claims, thereby calling into question whether the Settlement releases the Intervenors from as-yet-undetermined, valuable claims.

Furthermore, Appellant argues that the Bankruptcy Court placed improper weight on two secured creditors' support for the Settlement, contending that only "insider" creditors supported the Settlement. (*Id.* at 33.) First, Appellant points to Bank7, whose Chairman evidently owns one of the entities — WBP — subject to release from "any and all claims" pursuant to the Settlement. (*Id.* at 36 n.5, citing to 9019 Hearing Transcript.) Second, Appellant argues that because the DIP Lender *and* Bank7 qualify as secured creditors that will get paid from their security interests on Appellee's property, these creditors' support for the Settlement should carry less weight than the Bankruptcy Court placed. (*Id.* at 33, 36.)

Lastly, Appellant highlights the unexplained $1.2 million reduction in a receivable that William Schettine owed to Appellee, as reflected by Appellee's 2018–2019 financial statements, to contend that in the absence of information regarding this reduction in money owed by the company president to the debtor in possession, the Bankruptcy Court erred in determining that the Settlement served the best interests of creditors. (*Id.* at 33–34.)

41

As Appellee notes in response, general unsecured creditors such as Appellant stand lowest on the priority ladder to receive bankruptcy estate distributions. (Appellee Br. at 33–34); *see also Czyzewski v. Jevic Holding Corp.*, 580 U.S. 451, 457 (2017) (describing general unsecured creditors as falling into the "low-priority" bucket for the Bankruptcy Code). And based on the 9019 Hearing testimony and related record, this Court sees no reason to conclude that the Bankruptcy Court abused its discretion to reach the factual finding that MorrisAnderson properly focused its analysis on bank statements, tax returns, independent CPA reports and financial information other than Appellee's QuickBooks ledgers, which MorrisAnderson deemed to be unreliable. Nor did the Bankruptcy Court abuse its discretion in finding that Rose performed his duties with proper integrity as Independent Director. The loud objection of a single unsecured creditor, standing alone, does not mean that the Bankruptcy Court fundamentally erred in approving the Settlement. *See In re Murray Metallurgical Coal Holdings, LLC*, 623 B.R. 444, 514–15 (Bankr. S.D. Ohio 2021) (noting that "the concept of benefit to the estate includes benefit to administrative claimholders, secured claimholders, priority claimholders, and, last in the priority scheme, the 'general unsecured'" creditors). Correspondingly, the mere facts that Bank7 and the DIP Lender supported the Settlement and constituted secured creditors do not negate their relevance, because secured creditors inherently stand higher on the priority list than do general unsecured creditors.

At the same time, Appellant raises substantive concerns regarding the process here. For instance, Bank7's ownership by an individual who apparently also owned one of the entities subject to release creates some doubt as to whether the truly fair and equitable outcome for the creditor body constituted approval of the Settlement. Especially given the lack of rigorous analysis concerning the nature of the released claims and the Settlement's blanket release of "any

and all claims," the Bankruptcy Court should have probed further on the existence or appearance of self-dealing in the Settlement negotiation process. In addition, MorrisAnderson's focus on cash transfers, without more work, may have left money on the table that could have maximized creditors' potential recovery, and the unexplained $1.2 million reduction in the receivable that William Schettine owed to Appellee certainly leaves questions.

Accordingly, the Court expresses doubt as to whether the Bankruptcy Court properly concluded that the Settlement qualified as fair and equitable and in the best interests of the creditor body. However, because the Bankruptcy Court made at least *some* reasonable factual findings on this *Austin* factor, the Court refrains from concluding that the Bankruptcy Court clearly erred on the factor.

In sum, then, the Court concludes that the Bankruptcy Court clearly erred in concluding that the *Austin* factors weighed in favor of approving the Settlement, especially due to the absence of evidence available to the Bankruptcy Court regarding the nature of the potential claims against Intervenors and the related lack of analysis regarding the probability of success on those claims. This lack of analysis created, as outlined above, additional problems regarding other *Austin* factors, which sprang from the insufficient record regarding the nature of the claims subject to the releases in the Settlement. This Court concludes that the Bankruptcy Court thus erred in determining that "the compromise does not 'fall[] below the lowest point of reasonableness.'" *Dale*, 2020 WL 6817059, at *7.

As the proponent of the Settlement, Appellee bore both "the burden of proof and . . . the burden of persuasion to establish that the settlement is both reasonable and in the best interests of the estate." *In re Three Rivers Woods*, 2001 WL 720620, at *6. And the Bankruptcy Court "must look at various factors and determine whether the compromise is in the best interest of the

43

estate and whether it is fair and equitable." *In re Frye*, 216 B.R. 166, 174 (Bankr. E.D. Va. 1997) (citing *Austin* factors). Here, however, the Bankruptcy Court possessed insufficient evidence regarding the nature of the claims that the Settlement purported to release. *Cf. In re A & C Properties*, 784 F.2d 1377, 1383 (9th Cir. 1986) (holding that bankruptcy court did not err in approving settlement that "set[] forth in detail the claims which it purports to settle . . . [and] the cost-benefit analysis of the relative merits of pursuing or settling the various claims"). In particular, unlike in the cases collected *supra* at note 9, the Bankruptcy Court conducted a cursory review of the probability of success in any ensuing litigation but nonetheless approved the Settlement.

Again, to be clear, the releases at issue here do not rise to the level of concern as did the sweeping third-party releases in *Mahwah*, because here, the releases concern one releasing entity (Appellee), rather than "anyone associated with Debtors as of the effective date of the plan." *Mahwah*, 636 B.R. at 660. But the Bankruptcy Court still confronted a proposal that released Intervenors — a collection of individuals and entities with close ties to the debtor in possession — from *any and all claims* that Appellee possessed against them, approving this proposal without the more exacting scrutiny that bankruptcy courts within and outside this District have previously conducted in applying the *Austin* factors. On this basis and in the absence of information regarding the claims subject to release, the Court finds that the Bankruptcy Court abused its discretion by failing to properly examine the *Austin* factors.

### e.   Other Evidentiary Issues

Appellant also objects to various decisions that the Bankruptcy Court made regarding admissibility of evidence during the 9019 Hearing. Contending that the Bankruptcy Court erred in admitting the MorrisAnderson report into evidence, allowing counsel for Intervenors to

examine witnesses and argue during the hearing, and transmuting judicially noticed documents into substantive evidence, Appellant characterizes the 9019 Hearing as "riddled with errors." (Appellant Br. at 2–3.) Appellee disagrees, contending that any evidentiary errors qualified as harmless. (Appellee Br. at 40.) The Court sees no reason to apply a microscope to these primary areas of evidentiary concern that Appellant raises, because the Court has already determined that the Bankruptcy Court abused its discretion in failing to properly scrutinize the *Austin* factors as part of assessing whether the Settlement constituted a fair and equitable compromise.

### 3.    Confirmation Order

The Court next considers whether the Bankruptcy Court abused its discretion in entering the Confirmation Order incorporating the terms of the Settlement when the Settlement Order lay subject to appeal and when the Plan did not address what would happen to its terms in the event of appellate reversal. The Court concludes that the Bankruptcy Court did so.

As an initial matter, Appellee argues that "Appellant no longer seeks to reverse the Confirmation Order," because Appellant did not object to the Disclosure Statement (which constituted part of the Plan) as to any issues concerning the Settlement Agreement or the Settlement Order. (Appellee Br. at 48–49.) In Appellee's telling, since Appellant did not do so, did not seek a stay pending appeal of the Confirmation Order and now seeks an "advisory opinion" from this Court as to the effect of reversal of the Settlement Order, Appellant has waived a challenge to the Confirmation Order. (*Id.* at 49.)

In reply, Appellant notes that it appealed the Confirmation Order by filing a separate notice of appeal on November 29, 2023. (Appellant Reply at 21, citing MW App. 0956–1058.) Furthermore, Appellee explicitly acknowledged Appellant's appeal of both the Settlement Order *and* the Confirmation Order in its position supporting consolidation of the two appeals before

45

this Court. (ECF No. 20.) The Court thus rejects Appellee's argument that Appellant does not independently seek reversal of the Confirmation Order.

The record reflects doubt as to what would happen to the treatment of claims upon reversal of the Settlement Order. As Appellant highlights, Appellee's counsel informed the Bankruptcy Court during the 9019 Hearing that the Plan did not need a "toggle" to account for appellate reversal of the Settlement Order, because the "plan is structured in a way where you don't need a toggle," and "it's not like there's a financial burden created in the event that that appeal is successful." No. 23-31377 (Bankr. E.D. Va. Nov. 15, 2023), ECF No. 386 at 128–30. But Appellee's repeated representations on these Consolidated Appeals indicate that such an unwinding would not be so smooth, leaving uncertainty as to whether the Bankruptcy Court properly resolved the impact of appellate reversal on the terms of the Plan and resolution of claims. Moreover, the Bankruptcy Court entered the Confirmation Order even though Appellant had already appealed the Settlement Order.

Ultimately, because of the uncertainty surrounding the impact of appellate reversal of the Settlement Order on the terms of the Plan, the Court concludes that the proper course of action regarding the Confirmation Order constitutes reversing the Confirmation Order and remanding to the Bankruptcy Court for clarification as to the preservation of parties' claims and defenses concerning the claims that had been released under the Settlement Order.

## IV.    CONCLUSION

For the reasons stated herein, the Court will therefore DENY Appellee's Motion to Dismiss, (ECF No. 27), will REVERSE the Bankruptcy Court's Settlement Order and REMAND these proceedings to the Bankruptcy Court to properly apply the *Austin* factors in considering

46

whether the Settlement qualifies as in the best interest of the bankruptcy estate and as a fair and equitable outcome for the estate's creditors.

The Court will also REVERSE and REMAND the Bankruptcy Court's Confirmation Order so that the Bankruptcy Court may determine the impact of reversal of the Settlement Order on the Plan's terms and, if needed, make any revisions to the Confirmation Plan upon reexamination of the proposed Settlement Agreement.

The Court emphasizes that it does not render judgment on the underlying merits of the releases that the Settlement Agreement provides to the Intervenors, nor on other specific components of the Settlement Agreement. Indeed, today's ruling does not mean that, upon remand, the Bankruptcy Court must rule in favor of Appellant on particular issues. Rather, the Court sends this case back to the Bankruptcy Court to more fulsomely examine the specific claims that stand subject to release and to ensure that a sufficiently robust record supports its findings.

In sum, the Bankruptcy Court should take to heart the Fourth Circuit's admonition (albeit in an administrative law context, but not less applicable to bankruptcy proceedings) that appellate review becomes "obstructed" by an insufficient explanation of a lower court's findings — "a problem decision makers could avoid by following the admonition they have no doubt heard since their grade-school math classes:  Show your work." *Molina Mendoza v. Sessions*, 712 F. App'x 240, 246 (4th Cir. 2018).

Let the Clerk file a copy of this Memorandum Opinion electronically, notify all counsel of record and forward a copy to United States Bankruptcy Judge Keith L. Phillips.

An appropriate Order shall issue.

/s/

David J. Novak
United States District Judge

Richmond, Virginia
Dated:  July 9, 2024

48